**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

STATE OF NEW MEXICO, *ex rel.*       )
HECTOR BALDERAS, Attorney General,   )
                                      )
                      Plaintiff,      )
                                      )
            v.                        )        Civil Action No. 1:17-cv-772
                                      )
DOLGENCORP, LLC (d/b/a DOLLAR        )
GENERAL, CORPORATION) a Kentucky     )
limited liability company,           )
                                      )
                      Defendant.      )

## NOTICE OF REMOVAL

Dolgencorp, LLC removes to this Court the civil action filed by New Mexico in the First

Judicial District Court, County of Santa Fe, New Mexico, *State of New Mexico, ex rel. Hector H.*

*Balderas, Attorney General v. Dolgencorp, LLC (d/b/a Dolgencorp, Corporation), a Kentucky*

*limited liability company*, Case No. D-101-CV-2017-01562.

Removal is appropriate because this Court retains subject matter jurisdiction over this

civil action on several bases. ***First***, New Mexico raises claims and relief that depend upon the

resolution of disputed and substantial questions of federal law, including questions under the

federal Clean Air Act ("CAA") and the federal weights and measures scheme governing the

labeling of motor oils, as promulgated and endorsed by National Institute of Standards and

Technology ("NIST") and the Federal Trade Commission. *See* 28 U.S.C. §§ 1331; 1441(a);

*Grable & Sons Metal Prods., Inc v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314-15 (2005).

***Second***, New Mexico artfully pled a state-law claim to avoid invoking the federally-

established and approved (and state-adopted) weights and measures scheme that New Mexico

must confront to state a prima facie cause of action. *See* 28 U.S.C. §§ 1331; 1441(a); *Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1220 (8th Cir. 2006); *Turgeau v. Admin. Review Bd.*, 446 F.3d 1052, 1060 (10th Cir. 2006).

*Third*, New Mexico's claims are completely preempted under the CAA and the federal Clean Water Act ("CWA"). *See* 28 U.S.C. §§ 1331; 1441(a); *Griffioen v. Cedar Rapids & Iowa City RR. Co.*, 785 F.3d 1182, 1188 (8th Cir. 2015); *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1221 (10th Cir. 2011).

*Fourth*, New Mexico raises claims and relief that invoke jurisdiction under the Class Action Fairness Act. *See* 28 U.S.C. §§ 1332(d); 1441(a); *Louisiana ex rel. Caldwell v. Allstate Ins. Co.*, 536 F.3d 418 (5th Cir. 2008); *West Virginia ex rel. McGraw v. Comcast,* 705 F. Supp. 2d 441 (E.D. Pa. 2010).

## BACKGROUND

1.     This case is just one of many that comprise a nationwide litigation strategy against Dolgencorp (and related Dollar General entities) spurred on almost entirely by a small group of plaintiffs' attorneys, primarily the Kanner & Whiteley, L.L.C. law firm.

2.     At its core, New Mexico's civil action hinges on the theory that consumers are deceived into not knowing that certain "DG Auto" branded motor oil products are suitable for use with only particular ages of automobile engines—even though those products' labels contain express and conspicuous cautionary statements describing those suitable uses.

3.     New Mexico's allegations are identical or substantially similar to a bevy of complaints filed on behalf of private individuals. Those complaints were drafted by, or with the coordination of, the Kanner & Whiteley law firm.

4.      The Judicial Panel on Multidistrict Litigation ("JPML") consolidated those individuals' complaints for pretrial multidistrict litigation proceedings in the United States District Court for the Western District of Missouri.

5.      The MDL court appointed Mr. Allan Kanner of the Kanner & Whiteley law firm as lead counsel in those MDL proceedings.

6.      New Mexico retained Mr. Kanner and his firm as counsel in this litigation.

7.      The similarities between the individual complaints pending before the MDL court and New Mexico's civil action are as striking as they are undoubtedly intentional. The Kanner & Whiteley law firm entered into a contractual arrangement with New Mexico to provide "expertise and resource support" in this litigation against Dolgencorp. Phaedra Haywood, *AG, Campaign Donor's Law Firm Sue Dollar General*, Santa Fe New Mexican, June 7, 2017, at A-6, *available at* https://goo.gl/AQxDMH (last visited July 26, 2017).

8.      It is no surprise, then, that New Mexico's allegations essentially track (if not outright restate verbatim) the putative class action complaints authored by the Kanner & Whiteley law firm and that are pending in the MDL proceedings before the Western District of Missouri.

9.      The MDL proceedings have already engaged in Rule 12 briefing. The outcome of that briefing is awaiting resolution.

10.      New Mexico was informed of the MDL litigation.

11.      While the MDL proceedings were ongoing, New Mexico threatened to file suit against Dollar General Corporation for the sale of DG Auto motor oil products in New Mexico.

12.     In light of this threat, Dollar General Corporation filed a federal complaint in the United States District Court for the District of New Mexico under 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201.[1] *See* Doc. 1, *Dollar General Corporation v. Balderas*, No. 1:17-cv-00588-NF-KHR (D.N.M. May 25, 2017).

13.     This federal complaint requested (among other things) that, on the basis of federal law, New Mexico be restrained from pursuing its threatened suit. The complaint also requested (among other things) that, on the basis of theories grounded in federal law and in light of the questionable conduct surrounding plaintiff recruitment in the putative class actions,[2] the Kanner & Whiteley law firm be prevented from controlling or influencing New Mexico's litigation conduct.

14.     Dollar General "tagged" that that federal suit with the JPML in a notice of tag-along action to be transferred to MDL proceedings pending before the Western District of Missouri.

15.     Dollar General Corporation gave New Mexico notice of both the filing of the federal complaint as well as the tag with the JPML.

---

[1] Dollar General Corporation (doing business as Dolgencorp, LLC, DG Promotions, Inc., and DG Retail, LLC) is the plaintiff in that Declaratory Judgment action because this is the entity Attorney General Balderas threatened with liability. Later, in this case, New Mexico sued Dolgencorp rather than Dollar General Corporation. Dolgencorp will formally be added as a plaintiff to the Declaratory Judgment proceeding in light of New Mexico's change in focus among these Dollar General related entities.

[2] *See* Doc. 16, *In re: Dollar General Corp. Motor Oil Marketing & Sales Practices Litigation*, Master Case No. 16-02709-MD-W-GAF (W.D. Mo. July 6, 2016). Further briefing on this issue is under seal and pending before the MDL court.

16. New Mexico filed a motion with the JPML opposing the transfer of the federal suit to the MDL court. In response, Dollar General Corporation extensively detailed why that federal court suit should be transferred to the MDL court. New Mexico then filed a reply.

17. In opposing transfer of the federal suit to the MDL court, New Mexico represented to the JPML that the federal court suit and this state-filed suit are essentially two sides of the same litigation coin. *See* Doc. 42-1, at 10-11, *In re: Dollar General Corp. Motor Oil Marketing & Sales Practices Litigation*, MDL No. 2709 (J.P.M.L. June 22, 2017).

18. New Mexico also represented to the JPML that its state-filed suit is essentially the same as the putative class actions brought by individuals against Dollar General related entities pending before the MDL court—suits brought by or in coordination with New Mexico's outside counsel, Mr. Kanner and his law firm. *See id.* at 3-4, 9; *see also* Doc. 48, at 1, *In re: Dollar General Corp. Motor Oil Marketing & Sales Practices Litigation*, MDL No. 2709 (J.P.M.L. July 20, 2017).

19. Despite all of this, New Mexico filed this civil action in state court against Dolgencorp.

20. New Mexico's civil action against Dolgencorp has a home in federal court. In fact, its most proper place is before the United States District Court for the Western District of Missouri.

21. Dolgencorp removes this civil action to federal court, and will promptly take action for the JPML court to transfer this case to the MDL court for consolidated pretrial proceedings.

## PROCEDURAL REQUIREMENTS FOR REMOVAL

22.     Dolgencorp attaches as **Exhibit 1** a copy of all process, pleadings, and orders served in this action. To date, the state court's public docket contains the following items: (1) New Mexico's complaint, (2) issued summons, (3) returned summons, (4) Dolgencorp's limited entry of appearance, and (5) Dolgencorp's notice of peremptory excusal.

23.     This Court is a proper venue because New Mexico filed suit against Dolgencorp in the First Judicial District Court, County of Santa Fe, New Mexico. 28 U.S.C. § 1446(a).

24.     New Mexico served Dolgencorp on June 26, 2017. The removal of this action is timely because Dolgencorp received the initial pleading through service or otherwise within the past thirty days. 28 U.S.C. § 1446(b)(1).

25.     As there is only one defendant named in the complaint, and Dolgencorp is not aware of any other defendant that has been served or made an appearance at the time of filing this notice of removal, the consent of other defendants is not required. 28 U.S.C. § 1446(b)(2).

26.     Counsel certifies that, promptly after filing this notice of removal, Dolgencorp will serve copies of the notice of removal with opposing counsel and file with the Clerk of Court of the First Judicial District Court, County of Santa Fe, New Mexico, to effect removal of the state court action. 28 U.S.C. § 1446(d).

## GROUNDS FOR REMOVAL

27.     Without waiving any arguments in support of removal, Dolgencorp sets forth a brief explanation of the reasons why removal is proper.

28.     Dolgencorp notes that many of the legal and factual bases for removal overlap. Related discussion about the same legal or factual matters are intended to be taken together,

Case 4:17-cv-00832-GAF     Document 1     Filed 07/26/17     Page 6 of 41

notwithstanding the particular heading under which the discussion arises. That said, Dolgencorp maintains that each distinct basis for removal (which encompasses all related discussion) stands on its own.

## I.    Federal Question Jurisdiction authorizes removal of this case.

29.    Removal may be had so long as a United States District Court would have original jurisdiction over that civil action. 28 U.S.C. § 1441(a). A United States District Court may exercise original jurisdiction over any civil action "arising under the Constitution, laws, or treatises of the United States." 28 U.S.C. § 1331.

30.    "A single claim over which federal-question jurisdiction exists is sufficient to allow removal." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2005); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005); *Phipps v. F.D.I.C.*, 417 F.3d 1006, 1010 (8th Cir. 2005).

31.    Under the well-pleaded complaint rule, Federal Question Jurisdiction exists over any claim if either (a) "federal law creates the cause of action" or (b) "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Firstenberg v. City of Santa Fe, N.M.*, 696 F.3d 1018, 1023 (10th Cir. 2012); *Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn. LLC*, 843 F.3d 325, 329 (8th Cir. 2016).

32.    An exception to the well-pleaded complaint rule is the artful pleading doctrine. "Under the artful pleading doctrine . . . a plaintiff may not defeat removal by failing to plead federal questions that are essential elements of the plaintiff's claim." *Turgeau v. Admin. Review Bd.*, 446 F.3d 1052, 1060 (10th Cir. 2006); *see also Rivet v. Regions Bank of La.*, 522 U.S. 470, 476 (1998); *Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1220 (8th Cir. 2006).

7

**A. Disputed issues of federal law are embedded in New Mexico's state-law claims.**

33.     Federal Question Jurisdiction exists when state-law claims implicate a substantial issue of federal law that is necessarily raised and actually disputed, and federal jurisdiction would not disturb a congressionally approved balance of federal and state judicial responsibilities. *Grable & Sons Metal Prods., Inc v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). That is, a state-law claim invokes Federal Question Jurisdiction if "federal issues [are] embedded" within it. *Id.*

34.     This branch of Federal Question Jurisdiction does not turn on how the plaintiff characterizes his claims. Instead, a court must evaluate whether the plaintiff's alleged right to relief necessarily raises these substantial and disputed federal issues. *Id.* (holding that "jurisdiction over federal issues embedded in state-law claims" is not foreclosed "simply because they appeared in state raiment"); *Cent. Iowa Power Co-op. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 561 F.3d 904, 912 (8th Cir. 2009).

*New Mexico's Public Nuisance Claim*

35.     New Mexico brought a common law public nuisance claim against Dolgencorp. Compl. ¶¶ 124-38. The claim alleges that particulate matter emanating from automobiles using the at-issue DG Auto motor oil harms human health and the environment. *Id.* ¶¶ 79-80, 85-87. New Mexico asserts that the purported public nuisance of "toxic air pollution interferes with New Mexico's efforts to comply with state and **federal** air quality standards." *Id.* ¶¶ 133-34 (emphasis added).

36.     This public nuisance claim has embedded within it substantial federal issues that implicate the CAA.

37.     "The CAA sets out a comprehensive regulatory scheme designed to prevent and control air pollution." *Her Majesty the Queen v. Detroit*, 874 F.2d 332, 335 (6th Cir. 1989). The CAA "makes the EPA responsible for developing acceptable levels of airborne emissions, known as National Ambient Air Quality Standards," which are primary standards (to protect individuals) and secondary standards (to protect the environment). *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 298-99 (4th Cir. 2010); *see also* 42 U.S.C. § 7409(b)(1), (b)(2).

38.     Under this authority, the EPA promulgated National Ambient Air Quality Standards for two emissions that New Mexico specifically alleged contributes to the purported public nuisance: carbon monoxide and nitrogen oxides. 40 C.F.R. §§ 50.8, 50.11; *see also* Compl. ¶¶ 81-84.

39.     "[E]ach state is required to create and submit to the EPA a State Implementation Plan." *Tenn. Valley Auth.*, 615 F.3d at 299. A State Implementation Plan "provides for implementation, maintenance, and enforcement" of the primary and secondary air quality standards. 42 U.S.C. § 7410(a)(1). If the EPA approves a State Implementation Plan, "its requirements become federal law and are fully enforceable in federal court." *Her Majesty the Queen*, 874 F.2d 332, at 335; *see also* 42 U.S.C. § 7604(a).

40.     A State Implementation Plan must do several things. *See* 42 U.S.C. § 7410(a)(2). In part, it must "contain adequate provisions . . . prohibiting . . . **any source or other type of emissions activity** within the State from emitting any air pollutant in amounts which will" interfere with other states' compliance with national air quality standards or their own State Implementation Plan. *Id.* § 7410(a)(2)(D)(i)(I), (II) (emphasis added).

9

41.     In light of this intricate and expansive federal law, New Mexico's public nuisance claim has embedded within it substantial federal issues implicating the CAA in at least two ways.

42.     First, New Mexico has pinned the state's injury on its purported inability to comply with state and federal air quality regulations. Compl. ¶¶ 133-34. New Mexico, having pled non-compliance with expansive federal law as part of its prima facie cause of action, established a substantial and disputed issue of federal law embedded in its public nuisance claim. *See Nicodemus v. Union Pac. Corp.*, 440 F.3d 1227, 1235 (10th Cir. 2006) (state-law claim had embedded federal issue when proving liability required adjudicating a legal right arising out of federal law); *Bd. of Com'rs of the Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co., LLC*, 29 F. Supp. 3d 808, 854-55 (E.D. La. 2014) (state public nuisance claim, based on alleged nuisance being caused by conduct in violation of federal regulatory standards, necessarily raised the issue of what these federal law duties were, thereby invoking Federal Question Jurisdiction).

43.     "While [New Mexico] may not be expressly challenging a specific action of a federal agency, the breadth of Plaintiff's claims amounts to a collateral attack on an entire regulatory scheme." *Bd. of Com'rs*, 29 F. Supp. 3d at 862. The regulatory scheme targeted by New Mexico is "the by-product[] of a federal effort to balance the country's economic need for oil and gas with local, regional, and national environmental concerns. [New Mexico's] claims are premised on the notion that this regulatory framework provides inadequate protection for the residents of [New Mexico]." *Id*.

44.     Second, New Mexico's public nuisance allegations plead that Dolgencorp's activity of selling DG Auto motor oil is a cause of the alleged particulate matter emissions

resulting in a public nuisance. Compl. ¶ 88. Under New Mexico's theory of the case, the sale of

motor oil is itself an "emissions activity" under the CAA.[3]

45.     Consequently, this activity must be covered by New Mexico's State

Implementation Plan because it is an emissions activity that will interfere with other states'

compliance with the CAA. *See* Compl. ¶¶ 80, 86-87, 127, 129, 131 (pleading that emissions are

just expelled into the environment without any sort of limiting factor that would stop such

emissions from crossing state lines, so as to trigger 42 U.S.C. § 7410(a)(2)(D)(i)'s provisions).

46.     If the sale of the at-issue DG Auto motor oil products is permitted under New

Mexico's State Implementation Plan, as drafted by the New Mexico legislature, then that

emissions activity cannot be a nuisance as a matter of New Mexico law. *Espinosa v. Roswell*

*Tower, Inc.*, 910 P.2d 940, 944 (N.M. Ct. App. 1996); *Albuquerque v. State ex rel. Vill. of Los*

*Ranchos de Albuquerque*, 808 P.2d 58, 63-64 (N.M. Ct. App. 1991).

47.     A State Implementation Plan, once approved by the EPA, is federal law triggering

federal jurisdiction. *Sierra Club v. Pub. Serv. Co. of Colo., Inc.*, 894 F. Supp. 1455, 1456 (D.

Colo. 1995); *United States v. Congoleum Corp.*, 635 F. Supp. 174, 177 (E.D. Pa. 1986).

48.     Whether New Mexico identified an activity constituting a public nuisance—

thereby stating a prima facie claim—necessarily requires resolving the substantial federal issue

about whether Dolgencorp's sale of the DG Auto motor oil products is permitted under federal

law: New Mexico's State Implementation Plan. *See, e.g.*, *Tipp City v. Dayton*, 204 F.R.D. 388,

---

[3] This is how New Mexico pled its claims. Of course, Dolgencorp maintains that New Mexico's allegations cannot survive Rule 12. For example, New Mexico's public nuisance claim based on the marketing of motor oil must be dismissed under the remoteness doctrine (among other reasons).

394-95 (S.D. Ohio 2001) (state-law nuisance claim invoked Federal Question Jurisdiction because the claim rose or fell upon whether the defendant's conduct complied with federal law).

49.     Removal of this claim will not offend the federal-state balance approved by Congress. *See, e.g.*, *West Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 233-34 (E.D.N.Y. 2007) (denying remand of civil action brought by West Virginia Attorney General, when alleged "injuries [arose] from payments for drugs made as part of its participation in the federal Medicaid program," and therefore the embedded federal questions "encompass[ed] a broad range of federal regulatory and funding provisions").

*New Mexico's Theory of Liability: Labeling*

50.     New Mexico brings two statutory consumer protection claims against Dolgencorp based upon the sale of certain DG Auto motor oil products. Compl. ¶¶ 93, 113. New Mexico also brings one common law public nuisance claim based upon that same activity. *Id.* ¶ 125.

51.     New Mexico's theory of liability under each statutory claim boils down to allegedly inadequate and/or improper labeling of the DG Auto motor oil products. *Id.* ¶¶ 96-99, 114-16. To the extent New Mexico's theory of liability under the common law public nuisance claims relates in any way to Dolgencorp's conduct, it is also based on such labeling claims. *Id.* ¶¶ 126, 136.

52.     New Mexico alleges that the following labeling representations are actionable: the SAE nomenclature; the "DG Auto" and "Motor Oil" statements; the "Lubricates and protects your engine" statement; the checkered flag; the cautionary statements informing a customer for what automobile engines the motor oils should be used; and the truthful and accurate product descriptions about the nature and use of the motor oils. Compl. ¶¶ 27-30, 35, 37, 39-40.

53.     New Mexico's shelf placement and print advertisement theories of liability also rely on the DG Auto products' labeling statements. Compl. ¶¶ 52-66.

54.     Although New Mexico's claims are pled under state law, these claims necessarily raise actually disputed, substantial issues of federal law. New Mexico's claims challenge the weights and measures laws constitutionally committed to Congress, authorized through federal law, created and endorsed by federal agencies, and as adopted or approved by a multitude of states.

55.     The power to fix weights and measures is constitutionally committed to the Legislative Branch of the federal government. U.S. Const. art I, § 8, cl. 5. Pursuant to this constitutional commitment, Congress created the National Institute for Standards and Technology, a federal agency within the Department of Commerce. 15 U.S.C. § 272(a).

56.     NIST publishes uniform laws and regulations in the area of legal metrology and engine fuel quality. *See* 15 U.S.C. § 272(b). These NIST uniform laws and regulations are set forth in the publication Handbook 130. The Department of Commerce publishes in the Federal Register notices regarding meetings for the National Conference on Weights and Measures and proposed amendments to Handbook 130.

57.     In Handbook 130, NIST relies on and incorporates labeling standards or requirements from automotive industry associations such as the Society of Automotive Engineers ("SAE") and the American Petroleum Institute ("API").

58.     These uniform laws and regulations in Handbook 130 require or authorize the DG Auto motor oils' labeling statements that New Mexico uses as the basis for the labeling theory of liability. *See* Compl. ¶¶ 27-30, 35, 37, 39-40.

59.     Additionally, the FTC has long relied on NIST regulations (including Handbook 130) and the SAE standards NIST relies upon to interpret what is or is not a deceptive act and to promulgate regulations under the Federal Trade Commission Act. *See, e.g.*, *Renuzit Home Prods. Co.*, 99 F.T.C. 291 (1982), 1982 WL 608352 (requiring a company to substantiate its labeling claims by passing tests described in SAE J183); Rules, Regulations, Statements of General Policy or Interpretation and Exemptions Under the Fair Packaging and Labeling Act, 80 Fed. Reg. 71686 (Nov. 17, 2015) (relying on Handbook 133 in amending regulations, instead of Handbook 130, only because Handbook 133 happened to provide a "more comprehensive listing of" relevant information, but acknowledging the two Handbooks were "consistent"); *see also* 9 C.F.R. § 442.2; 16 C.F.R. §§ 500.19, 311.4 (incorporating or relying on other NIST publications).

60.     A large number of New Mexico's sister states have adopted NIST standards—including the relevant uniform laws or regulations in Handbook 130 requiring or authorizing the labeling conduct targeted by New Mexico's lawsuit—and/or have passed separate laws or regulations that require or authorize such labeling statements.

61.     New Mexico, through its state executive entity the Attorney General, seeks to alter, disrupt, rule upon, and penalize a weights and measure scheme that the Constitution commits to the federal Legislative Branch; that the federal Congress has authorized through law; that federal agencies have created or endorsed; and that sister states have adopted or approved.

62.     New Mexico's challenge to this weights and measure scheme manifests in its statutory consumer protection claims by identifying labeling conduct that is required or authorized by the federal Constitution, federal and state statutes, and federal and state agencies—

and then alleging that such conduct can give rise to staggering financial liability under New Mexico law. Compl. ¶¶ 97-100, 116-17.

63. New Mexico's challenge to this weights and measure scheme manifests in its common law public nuisance claim because a jury will have to determine whether labeling conduct required or authorized by the federal Constitution, federal and state statutes, and federal and state agencies is unreasonable. *Id.* ¶¶ 88, 125-26.

64. New Mexico's challenge to this weights and measure scheme manifests in its requested relief because New Mexico apparently seeks to apply its own state's laws in every jurisdiction where a Dollar General customer or a vehicle that used a DG Auto motor oil product can be found. *Id.* at 32, Request for Relief ¶ C(1)-(3) (demanding relief as to "all Dollar General customers" and "[a]ll automobiles in which DG Auto obsolete motor oil has been use[d]"). New Mexico seeks to make illegal and to impose a nationwide recovery scheme despite the fact that the federal and sister state sovereigns have required, authorized, or approved the at-issue labeling conduct.

65. Federal Question Jurisdiction exists because New Mexico, through state-law claims, attacks the weights and measure scheme constitutionally committed to the federal Congress, approved and authorized by Congress and federal agencies, adopted or replicated by sister states, and which undergoes a federal notice and comment process—and with which Dolgencorp's purportedly-liable conduct complies. *See, e.g.*, *Smith v. Kansas City Title & Tr. Co.*, 255 U.S. 180, 201 (1921) (federal jurisdiction extended over state-law claim requiring a decision on the constitutional validity of federal bond issuance); *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1021 (2d Cir. 2014) (state-law claims had embedded issue of

federal law when based on defendant's conduct required by federal law); *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (state-law claims challenging defendant's actions, approved by federal agency, had embedded substantial issues of federal law); *Bryan v. BellSouth Comms., Inc.*, 377 F.3d 424, 429-31 (4th Cir. 2004) (state-law unfair trade practices act claim based on a defendant's filed rate presented embedded federal issue by seeking "to alter the terms of the relationship between carrier and consumer set forth in a filed tariff").

66. That New Mexico is not litigating on a clean slate further establishes the presence of this substantial federal issue, and that it will not disrupt the federal-state balance approved by Congress. Over twenty lawsuits—filed on a putative class basis by individuals represented by New Mexico's retained counsel, Mr. Kanner and his law firm—are consolidated in MDL proceedings. The identical nature of New Mexico's assault on the federal weights and measure scheme to claims pending in MDL proceedings before a federal court further counsels for federal jurisdiction in this case. *See, e.g.*, *In re Zyprexa Prods. Liab. Litig.*, No. 04-MD-1596, 2008 WL 398378, at *6-7 (E.D.N.Y. Feb. 12, 2008) (finding that similar cases having been consolidated in multidistrict litigation proceedings weighed in favor of federal jurisdiction); *In re Pharm. Indus. Average Wholesale Price Litig.*, 457 F. Supp. 2d 77, 79-81 (D. Mass. 2006) ("As the judge assigned the massive multi-district litigation, involving class actions and numerous attorney general suits, I conclude that the issue of the meaning of AWP under the federal Medicare statute has national significance. A federal forum provides experience, solicitude and uniformity on this important federal issue.").

*New Mexico's Requested Relief*

67.     New Mexico seeks an award of "attorneys' fees and costs of suit." Compl. at 32, Request for Relief ¶ H. These attorneys' fees and costs are sought because of work done by and on behalf of (and to ultimately be paid to), private attorneys: members of the Kanner & Whiteley law firm. *See id.* at 33 (signature block).

68.     If a plaintiff's requested relief requires resolving substantial issues of federal law, Federal Question Jurisdiction exists. *See, e.g.*, *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 680 (5th Cir. 2001); *Morris v. Police Civil Serv. Comm'n for Charleston*, 977 F.2d 573, 1992 WL 296554, at *2 (4th Cir. Oct. 20, 1992) (unpublished table opinion); *see also New York v. Sinnecock Indian Nation*, 701 F.3d 101, 107 (2d Cir. 2012).

69.     Whether New Mexico is entitled to this form of requested relief will necessarily require answering (1) whether New Mexico can retain the Kanner & Whiteley law firm as outside counsel in this litigation; (2) whether New Mexico can collect attorneys' fees and costs generated by these private attorneys; and (3) whether New Mexico can then disburse that money to these private attorneys. These questions must be answered by the Due Process Clause of the United States Constitution. *See Merck Sharp & Dohme Corp. v. Conway*, 947 F. Supp. 2d 733, 739-44 (E.D. Ky. 2013) (looking to the terms of a contract between a state attorney general and outside counsel to determine whether that arrangement was permitted under the Constitution).

70.     Because the viability of New Mexico's requested relief for attorneys' fees and costs will require interpreting the validity of the contractual terms under federal law, Federal Question Jurisdiction exists. *See, e.g.*, *Wapato Heritage LLC v. Evans*, 430 F. App'x 557, 558 (9th Cir. 2011) (affirming Federal Question Jurisdiction over state law contract claim because

federal law set the conditions for the contract's "validity and effectiveness"); *Davis v. GMAC Mortg. LLC*, No. 4:11-CV-95, 2012 WL 860389, at *3-7 (M.D. Ga. Mar. 13, 2012) (finding Federal Question Jurisdiction because a substantial federal issue was embedded in a state contract claim that relied upon whether certain conduct governed by that contract violated a federal regulation).

71. Additionally, whether New Mexico can seek and obtain its requested relief further depends upon whether the actual knowledge and conduct of New Mexico and the retained outside counsel conforms to the Due Process Clause of the United States Constitution. *See Merck*, 947 F. Supp. 2d at 744-52.

72. Because the viability of New Mexico's requested relief for attorneys' fees and costs will require evaluating that contract-related conduct through the lens of federal law, Federal Question Jurisdiction exists. *See, e.g.*, *Mitchell v. Osceola Farms Co.*, 408 F. Supp. 2d 1275, 1279-80 (S.D. Fla. 2005) (finding Federal Question Jurisdiction because a substantial federal issue was embedded in a state law contract claim that depended on parole evidence to show the parties' intent, and the validity of the Plaintiffs' alleged intent depended on the federal purpose underlying those terms).

73. Whether a sovereign can force a citizen to pay private plaintiffs' attorneys the time and cost to assist the sovereign in suing that citizen is a significant issue of federal law that will not disrupt the federal-state balance approved by Congress. As New Mexico Attorney General Balderas explained to the JPML, "[m]any state attorneys general retain MDL leadership counsel to aid the state in its prosecution of corresponding state claims." Doc. 48, at 5 n.7, *In re: Dollar General Corp. Motor Oil Marketing & Sales Practices Litigation*, MDL No. 2709

(J.P.M.L. July 20, 2017). Resolving this federal issue will have a significant impact on this practice impacting federal MDL litigation and an area of law that lacks a robust body of case law. *See United States v. Loveland, Ohio*, 621 F.3d 465, 472 (6th Cir. 2010); *see, e.g.*, *N.Y. City Health & Hosps. Corp. v. Wellcare of N.Y.*, 769 F. Supp. 2d 250, 256-59 (S.D.N.Y. 2011) (denying remand when public-benefit corporation's contract claim required interpreting Medicare laws and regulations).

**B. New Mexico artfully pled its claims to avoid Federal Question Jurisdiction.**

74.     New Mexico artfully pled its complaint to avoid invoking federal law. This tactic does not foreclose Federal Question Jurisdiction. Instead, Federal Question Jurisdiction exists despite artful pleading. *Turgeau*, 446 F.3d at 1060; *Chaganti & Assocs.*, 470 F.3d at 1220.

75.     New Mexico brings two statutory consumer protection claims: one under the New Mexico Unfair Practices Act ("UPA") and another under the New Mexico False Advertising Act ("FAA"). Compl. ¶¶ 93, 113.

76.     Both statutory claims have what are colloquially referred to as a "safe harbor." *See* NMSA 1978, §§ 57-12-7; 57-15-4. Generally, each statute's safe harbor protects from liability conduct that complies with some other law.

77.     Relevant to subject matter jurisdiction is that these safe harbors operate differently within their respective statutory schemes.

78.     Under the FAA, the New Mexico Legislature made it a "complete defense" to a claim if the at-issue "advertisement is subject to and complies with the rules and regulations of, and the statutes administered by the federal trade commission." NMSA 1978, § 57-15-4.

79.     The key term in the FAA's statutory safe harbor language is "defense." The nature of the well-pleaded complaint doctrine does not permit a defense to trigger federal subject matter jurisdiction. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004).

80.     The UPA is different. The UPA provides "[e]xemptions" to the UPA right of action. These exemptions place an affirmative limitation on the scope of the statute's reach—and therefore the reach of any plaintiff's UPA claim.

81.     The motor oil labeling underlying New Mexico's claims is exempted from the scope of the UPA by being expressly permitted under laws administered by regulatory bodies of the United States: Handbook 130 and the National Institute of Standards and Technology Law, 15 U.S.C. § 271, *et seq.*, as administered by NIST; and the Federal Trade Commission Act, 15 U.S.C. § 43, *et seq.*, as administered by the Federal Trade Commission.

82.     The UPA statute makes clear—by conspicuously not using the term—that its safe harbor is not a "defense" to a UPA claim. The New Mexico Legislature knows how to use different words in different statutes to mean different things. *See, e.g.*, *In re Estate of McElveny*, 355 P.3d 75, 79 (N.M. Ct. App. 2015) (holding that "may" and "shall" should not be used interchangeably in different statutes because they are different words with different meanings).

83.     Whereas the FAA's safe harbor is a "complete defense," the UPA's safe harbor is an "exemption[]." This difference in language between the FAA and UPA must mean something different between these related statutes. *See Attorney General v. N.M. Pub. Reg. Comm'n*, 258 P.3d 453, 456 (N.M. 2011) (statutes that are related to the same subject matter are read together to construe their statutory language); *State v. Jade G.*, 154 P.3d 659, 667-68 (N.M. 2007)

(omission of a word in one part of a statute that is included elsewhere must be given effect as intentional).

84.     This exemption provision is a legislatively-imposed restriction on the scope of an UPA right of action. This exemption provides "an exception to the general protections of the UPA," whereby courts are required to defer to regulatory expertise and the UPA does not permit the "fundamentally unfair" situation of penalizing actions required or authorized by statutes or regulations. *Quynh Truong v. Allstate Ins. Co.*, 227 P.3d 73, 82 (N.M. 2010).

85.     This limitation on the right to sue is not an affirmative defense in the same vein as the FAA's safe harbor. It is instead a limitation on the ability to even bring a claim under the statute. This is an issue going to whether New Mexico has pled its prima facie ability to sue under the statute. *Deutsche Bank Nat'l Tr. Co. v. Johnston*, 369 P.3d 1046, 1051 (N.M. 2016) ("[T]he question of whether a party has standing to sue is not distinct from whether that party can assert a cause of action under a particular statute."). If the at-issue conduct is permitted under the UPA's safe harbor, a plaintiff has no statutory claim and therefore lacks standing to bring suit.

86.     New Mexico has the burden to show it can state a prima facie claim and has statutory standing under the UPA. *See Key v. Chrysler Motors Corp.*, 918 P.2d 350, 354 (N.M. 1996).

87.     In the face of the at-issue labeling conduct being expressly permitted under laws administered by federal regulatory bodies—and therefore unable to actually give rise to a claim under the UPA—New Mexico omitted pleading the "necessary federal questions" about how it

actually can assert a claim under the UPA. *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475 (1998).

88.     That is, New Mexico failed to plead the facts—which necessarily implicate federal questions in light of the existing federal regulatory scheme—about how it has standing to assert its UPA claim. *See R.I. Fishermen's Alliance, Inc. v. R.I. Dep't of Env'tl Mgmt.*, 585 F.3d 42, 49 (1st Cir. 2009) (suit invoked Federal Question Jurisdiction when the state statute giving rise to the claim expressly made itself dependent upon federal law).

**C. New Mexico's public nuisance claim is completely preempted.**

89.     A "state-law claim may be removed to federal court when a federal statute wholly displaces the state-law cause of action, resulting in complete preemption." *Griffioen v. Cedar Rapids & Iowa City RR. Co.*, 785 F.3d 1182, 1188 (8th Cir. 2015). "This is so because when a federal statute completely preempts a state-law cause of action, the state-law claim is properly recharacterized as a complaint arising under federal law." *Id.* at 1888-89.

90.     Claims are completely preempted when "they fall within the scope of federal statutes intended by Congress [to] completely . . . displace all state law on the given issue and comprehensively to regulate the area." *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1221 (10th Cir. 2011).

*The Clean Air Act*

91.     New Mexico's theory of liability for public nuisance is that Dolgencorp sells certain motor oil in a deceptive manner. Compl. ¶¶ 88, 126, 135-36. That theory depends entirely on injury to persons and the environment resulting from automobile emissions. *Id.* ¶¶ 73-89, 127-

29. Inherent to New Mexico's public nuisance claim is that certain automobile engines cannot adequately process the at-issue DG Auto motor oils to prevent the alleged public nuisance.

92.     The CAA is a statutory scheme that undoubtedly envisions states having some role in the regulation and enforcement of emissions standards. *See Tenn. Valley Auth.*, 615 F.3d at 303.

93.     But the CAA removes from state authority certain powers to regulate or enforce vehicle emissions standards. *See* 42 U.S.C. § 7416 (expressly carving out exceptions to the CAA otherwise permitting any state to adopt or enforce "any standard or limitation respecting emissions of air pollutants" and "any requirement respecting control or abatement of air pollution"). These powers are purely federal in nature.

94.     For example, "it is crystal clear that, absent waiver, a state cannot promulgate its own emissions standards for vehicles—such regulations are expressly preempted by § 209(a) of the CAA." *Jackson v. Gen. Motors Corp.*, 770 F. Supp. 2d 570, 574 (S.D.N.Y. 2011); *see also* 42 U.S.C. § 7543(a) ("No state . . . shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."); *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252-55 (2004).

95.     The CAA leaves no doubt that, in "contrast to federally encouraged state control over stationary sources [of environmental pollution], regulation of motor vehicle emissions ha[s] been a principally federal project." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079 (D.C. Cir. 1996); *see also Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 938 (9th Cir. 2011) ("On the other hand, the federal government sets nationwide emissions standards for mobile sources"); *id.* ("The regulatory

difference is explained in part by the difficulty of subjecting motor vehicles, which readily move across state boundaries, to control by individual states.").

96.    Without national control, the transitory nature of cars could create regulatory "nightmares" for manufacturers, who would otherwise face fifty different standards in fifty different states—not to mention additional standards from other localities. *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979). Simply, "the possibility of 50 different state regulatory regimes raised the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers." *Engine Mfrs. Ass'n*, 88 F.3d at 1079.

97.    Other provisions of the CAA confirm Congress's intent for the federal government to maintain control over mobile emissions standards, including:

- Section 202(a)(l) of the CAA directs the EPA to "prescribe . . . standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines." *See* 42 U.S.C. § 7521(a)(l).

- Section 203(a) of the CAA enumerates prohibited acts under the CAA.

- Section 204 requires that actions to enjoin violations of section 203(a) be brought in the name of the United States. *Id.* § 7523(b).

- Section 205 allows only the EPA Administrator to bring an action for civil penalties for violations of section 203(a). *Id.* § 7524(b).

- Section 206 requires the EPA to set up a testing process to ensure that vehicles and engines conform with the emissions standards set by section 202 and any associated regulations. *Id.* § 7525. The EPA must certify that each vehicle or engine on the market conforms to these standards. Without such certification the vehicle cannot be sold. *Id.*

- Section 207(c) permits only the EPA Administrator to pursue a product recall if a substantial number of vehicles do not meet emission standards set forth in regulations prescribed under section 202. *Id.* § 7541(c).

- Section 304 allows citizen suits in federal district courts to enforce certain emission standards. *Id.* § 7604.

98. The sole exception to total federal control is the CAA provisions that allow California to develop and enforce more stringent emissions standards and regulations. *See id.* § 7543(b)(1). Even then, EPA must review and approve California's proposals. *See id.*; *see also Virginia v. EPA*, 108 F.3d 1397, 1401 (D.C. Cir. 1997) ("[O]ne must understand that there are two, and only two, permissible sets of regulations limiting emissions from new cars sold in the United States. There are the California regulations; and there are the federal regulations."), *modified in nonrelevant part on reh'g,* 116 F.3d 499 (D.C. Cir. 1997); *Motor & Equip. Mfrs. Ass'n*, 627 F. 2d at 1109 ("[Congress] expressed its intent to occupy the regulatory role over emissions control to the exclusion of all the states . . . except California.").

99. This reservation of federal authority—and abolishment of state authority—is limited to "new motor vehicles," which are those automobiles that have not yet been sold to the ultimate purchaser. 42 U.S.C. § 7550(3).

100. New Mexico is attempting to regulate all post-1988 automobiles by pressing a theory of liability (and therefore imposing regulation-through-litigation) that post-1988 automobiles cannot use a certain API category of motor oil unless that vehicle has an engine that can process such motor oil without discharging certain emissions or particulate matter.

101. New Mexico's attempt to regulate-through-litigation[4] the control of emissions from **all** post-1988 automobiles necessarily includes regulation of new motor vehicles. Through

---

[4] At heart, New Mexico's suit is an attempt to unilaterally ban the sale of the motor oil products at issue despite the fact that the New Mexico legislature has not passed legislation to this effect. In doing so, New Mexico asks the Court to implement a ban of products that are legal to sell in 49 states (California being the sole exception, and only as of 2016). New Mexico also asks the

this regulation-by-litigation, New Mexico seeks to impose an emissions standard which provides that all post-1988 automobiles (including new motor vehicles[5]) cannot use a certain API category of motor oil unless that vehicle has an engine that can process such motor oil without discharging certain emissions or particulate matter.

102.    New Mexico's public nuisance claim is aimed to regulate all post-1988 motor vehicles, including new motor vehicles. New Mexico's claim is therefore a creature of federal law because Congress has occupied the field about, foreclosed state law on, and comprehensively regulated new motor vehicles. New Mexico's public nuisance claim is thus completely preempted. *See Engine Mfrs. Ass'n*, 541 U.S. at 252-55; *see also Arizona v. United States*, 567 U.S. 387, 402 (20120 (when a comprehensive federal scheme exists, a state cannot "give itself independent authority to prosecute federal . . . violations," even if the state "has the same aim as federal law and adopts its substantive standards").

*The Clean Water Act*

103.    New Mexico's public nuisance claim is also based on the spoliation of clean water. Compl. ¶¶ 90, 131.

104.    The Supreme Court has recognized that the CWA preempts all common law nuisance suits **unless** that claim is based upon the state law of where the pollution's source point is located. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494-500 (1987) (after 1972 amendments, holding CWA preempted affected state's common law nuisance claim); *Milwaukee v. Illinois*,

---

Court to declare these products' labeling to be misleading and deceptive—despite the fact that this labeling language is required or authorized by federal and state legislatures and agencies.

[5] New Mexico's claims seek to regulate new motor vehicles still being produced and all other post-1988 vehicles that were, at the relevant time, a new motor vehicle.

451 U.S. 304, 317-18 (1981) (after 1972 amendments, holding CWA preempted federal common law nuisance claim); *see also Arkansas v. Oklahoma*, 503 U.S. 91, 100 (1992) ("The Court held the Clean Water Act taken as a whole, its purposes and its history pre-empted an action based on the law of the affected State and that the only state law applicable to an interstate discharge is the law of the State in which the point source is located." (discussing *Int'l Paper Co.*)).

105.     Consequently, "federal law, and specifically the CWA, governs actions based upon interstate water pollution." *Pennsylvania v. Consol Energy, Inc.*, No. 1:11CV161, 2012 WL 3834878, at *7 (N.D. W. Va. Sept. 4, 2012). The only way a nuisance suit based upon the spoliation of waters is not completely preempted is if the claim is based upon the law of the point source—rather than the state law of the affected state. *See, e.g.*, *id.* at *1, 7 (Pennsylvania suing over pollution activities that occurred in West Virginia under West Virginia law was not preempted); *Tech. Rubber Co. v. Buckeye Egg Farm, L.P.*, No. 2:99-CV-1413, 2000 WL 782131, at *4 (S.D. Ohio June 16, 2000) (Ohio plaintiffs suing over pollution activities that occurred in Ohio under Ohio law was not preempted); *Portage Cty. Bd. of Comm'rs v. Akron*, 12 F. Supp. 2d 693, 701-02 (N.D. Ohio 1998) (Ohio entity suing Ohio city over pollution activities that occurred in Ohio under Ohio law was not preempted).

106.     The term "point source" is defined under the CWA as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The "point source" term "was designed to further [the purpose of the CWA] by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the

waters of the United States." *United States v. Earth Scis., Inc.*, 599 F.2d 368, 373 (10th Cir. 1979); *see also United States v. West Indies Transp., Inc.*, 127 F.3d 299, 309 (3d Cir. 1997).

107. New Mexico alleges two point sources. First are the automobiles in which the at-issue DG Auto motor oil has been used. Compl. ¶¶ 74, 79-87, 127-29. Second are the at-issue DG Auto motor oil bottles themselves. *Id.* ¶¶ 73, 78-79, 88, 126-29.

108. In neither instance is the point source necessarily and exclusively confined to the territorial limits of New Mexico. In its complaint, New Mexico broadly refers to "New Mexico customers" who purchase DG Auto motor oil and use it in their vehicles. *See, e.g.*, Compl. ¶ 73.

109. It is unclear if New Mexico is referring to New Mexico residents who purchase DG Auto motor oil from New Mexico retail stores, residents and nonresidents alike who purchase DG Auto motor oil from New Mexico retail stores, or New Mexico residents who purchase DG Auto motor oil from retail stores located anywhere.

110. Regardless, each of these scenarios encompasses persons who do not open the DG Auto motor oil bottle within the territorial limits of New Mexico, who do not add the DG Auto motor oil to their automobile within the territorial limits of New Mexico, and who do not drive (at least exclusively) within the territorial limits of New Mexico after having used the DG Auto motor oil with their automobile.

111. New Mexico's public nuisance claim is not confined to point sources located solely within New Mexico, though New Mexico claims to be the affected state. New Mexico's common law public nuisance claim is therefore based, at least in part, on the affected state's law

(that is, New Mexico's law) rather than the point source state's laws.[6] New Mexico's public

nuisance claim is thus completely preempted. *Arkansas*, 503 U.S. at 100.

## II.     The Class Action Fairness Act authorizes removal of this case.

112.     Removal may be had so long as a United States District Court would have

original jurisdiction over that civil action. 28 U.S.C. § 1441(a). Under the Class Action Fairness

Act, a United States District Court may exercise original jurisdiction over any class action where

(1) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and

costs," (2) there is minimal diversity between the parties, and (3) there are at least 100 members

of the putative class. 28 U.S.C. § 1332(d); *Dammann v. Progressive Direct Ins. Co.*, 856 F.3d

580, 583 (8th Cir. 2017); *Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1262 (10th Cir. 2014).

113.     New Mexico brings a lawsuit that resembles a purported class action and is the

functional equivalent of a class action for purposes of CAFA.

114.     This case resembles *Louisiana ex rel. Caldwell v. Allstate Ins. Co.*, 536 F.3d 418

(5th Cir. 2008). In *Caldwell*, the Fifth Circuit affirmed the removal of a civil action, filed by the

Louisiana Attorney General on behalf of the state, under CAFA. *Id.* at 432.

115.     The key to the Fifth Circuit's decision was that Louisiana's suit, in "seek[ing]

redress against violators [of the state's Monopolies Act] on behalf of both the state and private

parties," meant that private individuals were the real parties in interest for some of the relief

---

[6] Underscoring the point is that New Mexico wants to use this lawsuit to reach into and impose
its standards in other states. *See* Compl. at 32, Request for Relief ¶ C. New Mexico thus wants to
apply the law of the allegedly affected state (New Mexico) to point source states (sister states).
This is precisely the type of litigation that is completely preempted. *See Arkansas*, 503 U.S. at
100.

sought. *Id.* at 428-30. Consequently, those private individuals, as real parties in interest, could be considered to determine whether federal jurisdiction existed under CAFA. *Id.* at 430.[7]

116. This case stands on equal footing with *West Virginia ex rel. McGraw v. Comcast,* 705 F. Supp. 2d 441 (E.D. Pa. 2010). In *Comcast*, the Eastern District of Pennsylvania denied remand of a civil action, filed by the West Virginia Attorney General on behalf of the state, because CAFA established federal jurisdiction. *Id.* at 443.

117. The court held that because some of the relief sought by West Virginia would be recovered on behalf of a group of individuals, those private individuals were the real parties in interest for that relief. *Id.* at 449-50. The court then held that those private individuals, as the real parties in interest, satisfied CAFA's class action minimal diversity and numerosity requirements. *Id.* at 450, 452.

118. Finally, the court held that West Virginia's lawsuit was sufficiently similar to Federal Rule of Civil Procedure 23 so as to qualify under CAFA's "class action" definition. *Id.* at 452. This was true even though West Virginia brought suit under the West Virginia Antitrust Act and not West Virginia Rule of Civil Procedure 23 (the state's provision for class actions). *Id.* The court held that the lawsuit was "sufficiently similar" to Federal Rule of Civil Procedure 23 to meet the "class action" definition because the statute required the Attorney General to give

---

[7] The Fifth Circuit held that this analysis established jurisdiction under CAFA's mass action provisions, and therefore did not address the trial court's determination that CAFA's class action provisions were also satisfied. *Caldwell*, 536 F.3d at 430. Of course, the Supreme Court foreclosed the ability to use a real parties in interest analysis to determine the 100 "persons" requirement for CAFA's mass action provisions. *Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S. Ct. 736, 742 (2014). The Supreme Court, however, indicated that real parties in interest were still relevant outside of the specific statutory language of CAFA's mass action provisions. *See id.* at 741 & n.2, 745-46 & n.8. CAFA's class action provisions continue to retain a real parties in interest analysis.

notice of the suit, such a suit had res judicata consequences for the real parties in interest, and those private individuals could exclude themselves from the litigation. *Id.* at 452-54.

**A. New Mexico brings a lawsuit that resembles a purported class action.**

119.    A class action that triggers CAFA jurisdiction is "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § (d)(1)(B).

120.    "The Senate Judiciary Committee Report notes that the definition of a class action should be 'interpreted liberally.'" *Comcast,* 705 F. Supp. 2d at 452. "Generally speaking, **lawsuits that resemble a purported class action** should be considered class actions for the purpose of applying [CAFA's] provisions." S. Rep. No. 109-14, at 35 (2005) (emphasis added); *see also Brown v. Mortg. Elec. Registration Sys., Inc.*, 738 F.3d 926, 931 n.6 (8th Cir. 2013); *Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*, 731 F.3d 740, 742 (7th Cir. 2013).

121.    This makes sense in light of the purpose underlying CAFA. "CAFA was enacted to respond to perceived abusive practices by plaintiffs and their attorneys in litigating major class actions with interstate features in state courts." *Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1243 (10th Cir. 2009); *see also* Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 2(a)(4), 119 Stat. 4, 5 (identifying the different types of "[a]buses in class actions [that] undermine the national judicial system," which CAFA was intended to address).

122.    To this end, courts have held that state consumer protection statutes have the potential to be sufficiently similar to Federal Rule of Civil Procedure 23. *See, e.g.*, *Comcast,* 705 F. Supp. 2d at 452-53 ("The WVAA, with its procedural protections for consumers represented

31

by the State, is sufficiently similar to federal Rule 23 to meet CAFA's requirement for class actions.").

123.    New Mexico's "lawsuit . . . resemble[s] a purported class action" in form and substance. S. Rep. No. 109-14, at 35. This is not an academic exercise. Twenty-two putative class actions are pending before the MDL court in the Western District of Missouri. The main difference between this lawsuit and those self-identified putative class actions is simply the case caption. And while New Mexico asserts a public nuisance claim, which is not found in the individuals' putative class actions, this does not actually provide any meaningful distinction. Otherwise—no doubt owing to the Kanner & Whiteley law firm likely having a substantial hand in drafting the complaints—the structure, scope, and substance of the claims and relief are largely identical between these actions.[8]

124.    Quite literally, New Mexico's lawsuit resembles (and, in fact, duplicates) these existing putative class action lawsuits. New Mexico brings statutory consumer protection claims that closely resemble or quote verbatim these private individuals' putative class actions. *See, e.g.*, Doc. 44, at 8-23 & ¶¶ 36-81, *In re: Dollar General Corp. Motor Oil Marketing & Sales Practices Litigation*, Master Case No. 16-02709-MD-W-GAF (W.D. Mo. Aug. 29, 2016).

125.    New Mexico also brings a public nuisance claim. This claim relies on the same allegedly liable conduct as the statutory consumer protection claims. Compl. ¶ 88. Moreover, this is not the first time the Kanner & Whiteley law firm has been the driving force behind environmental claims about the sale of DG Auto motor oil products. The Kanner & Whiteley

---

[8] That similarities exist between these proceedings cannot be used to argue that a class action is the appropriate vehicle to resolve any claim. Common answers—not common issues—are required to meet Federal Rule of Civil Procedure 23's commonality requirement. *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 349 (2011).

firm authored environmental harm claims on behalf of California citizens in putative class actions that were substantially similar in content and theme to New Mexico's public nuisance claim. *See, e.g.*, Doc. 32, at 12-13 & ¶¶ 46-50, *Vega v. Dolgencorp, LLC*, Case No. 5:16-cv-00242-FMO-DTB (C.D. Cal. May 12, 2016). After that case was transferred to the MDL court, however, these environmental harm claims were omitted from the consolidated amended class action complaint.

126.    What's past is prologue when it comes to New Mexico's suit. The pending putative class actions brought by private individuals and authored by the Kanner & Whiteley law firm are the template for the structure and content of New Mexico's claims. New Mexico's lawsuit goes well beyond simply "resembl[ing] a purported class action." S. Rep. No. 109-14, at 35. New Mexico's lawsuit extensively duplicates existing putative class actions in form and substance.

127.    Turning to the specifics of New Mexico's lawsuit further confirms its equivalence to a typical class action lawsuit. New Mexico invokes the equitable jurisdiction of the court to require Dolgencorp to give notice to all potential members of the class: customers of the DG Auto motor oil products. Specifically, New Mexico demands that Dolgencorp "disseminate . . . disclosures" about the DG Auto motor oil products, thereby acting as a notice mechanism. Compl. ¶ 102.

128.    Having invoked the court's equity jurisdiction, New Mexico further demands that Dolgencorp provide notice of the DG Auto motor oil's use to every single Dollar General

customer throughout America—and to then set up an inspection and repair program for such customers. *Id.* at 32, Request for Relief ¶ C(1)-(3).[9]

129.    New Mexico, wielding the lawsuit to provide notice to putative class members, has brought the functional equivalent of a class action. *Comcast,* 704 F. Supp. 2d at 454.

130.    New Mexico's lawsuit will also have preclusive effect on those putative class members. The restitution sought under New Mexico's UPA has preclusive and binding effect on class members: the real parties in interest for these claims, the purchasers of the DG Auto motor oil. NMSA 1978, § 57-12-9(B); *see also New Mexico ex rel. King v. Capital One Bank (USA) N.A.*, 980 F. Supp. 2d 1346, 1351, 1356 (D.N.M. 2013) (adjudication of private customers' claims for restitution under the UPA forecloses New Mexico from seeking to recover restitution in a separate action under the UPA).

131.    This preclusive effect further confirms that New Mexico's lawsuit resembles a putative class action. *Comcast,* 704 F. Supp. 2d at 454.

132.    Finally, in light of that res judicata effect of New Mexico's UPA claim on the real parties in interest, the New Mexico Legislature gave those class members the ability to exclude themselves from the litigation. NMSA 1978, § 57-12-9(B).

133.    This opt-out ability cements a holding that New Mexico's lawsuit resembles a putative class action so as to trigger CAFA's jurisdiction. *Comcast,* 704 F. Supp. 2d at 454.

---

[9] New Mexico thus apparently seeks to apply New Mexico law nationwide, in every state in which a Dolgencorp customer or related automobile can be found. This relief underscores what the rest of New Mexico's claims already establish: that New Mexico's suit is not a local controversy, New Mexico's suit implicates significant federal (and federalism) concerns, and the appropriate forum to resolve these issues is federal court.

134. In sum, New Mexico's civil action under the New Mexico UPA is sufficiently similar to a Rule 23 class action so as to satisfy CAFA's definition of "class action." *See Williams v. Employers Mut. Cas. Co.*, 845 F.3d 891, 901 (8th Cir. 2017) (affirming removal under CAFA's class action provisions by looking to the substance of plaintiff's allegations, because "[t]o hold otherwise would prioritize a complaint's use of magic words over its factual allegations").

**B. The minimal diversity requirement is met.**

135. Minimal diversity under CAFA requires that "only one member of the plaintiff class—named or unnamed—must be diverse from any one defendant." *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1193 n.24 (11th Cir. 2007); *see also* 28 U.S.C. § 1332(d)(2).

136. Dolgencorp is incorporated under the laws of Kentucky with its headquarters in Tennessee. Compl. ¶ 13. It is therefore a citizen of Kentucky and Tennessee for diversity purposes.

137. New Mexico is the only named plaintiff. Compl. ¶ 13. Generally, a state is not a "citizen" of any state for purposes of diversity. *Brown v. Francis*, 75 F.3d 860, 865 (3d Cir. 1996); *see also Postal Tel. Cable Co. v. Alabama*, 155 U.S. 482, 487 (1894).

138. An exception exists when the "essential nature and effect of the proceeding" shows that the state is not actually the, or the only, real party in interest. *New Mexico v. Regan*, 745 F.2d 1318, 1320 (10th Cir. 1984); *Am. Re-Insurance Co. v. Janklow*, 676 F.2d 1177, 1181 (8th Cir. 1982); *see also Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (1980) ("[A] federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy."). "It is well-established that in determining whether there is

Case 4:17-cv-00832-GAF    Document 1    Filed 07/26/17    Page 35 of 41

jurisdiction, federal courts look to the substance of the action and not only at the labels that the parties may attach." *Caldwell*, 536 F.3d at 424.

139.    "Not all that a [s]tate does . . . is based on its sovereign character." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). One such non-sovereign activity is when a state, "for a variety of reasons, attempt[s] to pursue the interests of a private party, and pursue[s] those interests only for the sake of the real party in interest." *Id.* at 602. "Interests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the [s]tate's aiding in their achievement. In such situations, the [s]tate is no more than a nominal party." *Id.*

140.    For example, although a state can recover (in its sovereign capacity) treble damages in antitrust claims alleging harm to the state's propriety interests, and private individuals can recover treble damages in antitrust claims alleging harm to the individual's proprietary interests, a state cannot recover treble damages to its general economy under its *parens patriae* authority because to do so "would open the door to duplicative recoveries." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262-63 (1972).

141.    Simply put: a state's sovereign authority is not coextensive with the private individual's right to recovery. *Pennsylvania v. Mid-Atl. Toyota Distribs., Inc.*, 704 F.2d 125, 129 n.8 (4th Cir. 1983) ("No state has a legitimate quasi-sovereign interest in seeing that consumers or any other group of persons receive a given sum of money.").

142.    A state is therefore not the (or at least not the only) real party in interest "when a state undertakes to sue for the particular benefit of a limited number of citizens." *Caldwell*, 536 F.3d at 428; *see, e.g.*, *Connecticut v. Chubb Grp. of Ins. Cos.*, No. 3:11–cv–997 (AWT), 2012

WL 1110488, at *3-4 (D.Conn. Mar. 31, 2012); *Hood v. F. Hoffman-La Roche, Ltd.*, 639 F. Supp. 2d 25, 31-33 (D.D.C. 2009); *see also Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S. Ct. 736, 742 (2014) (rejecting a real-parties-in-interest analysis under CAFA's mass action provision because the unique statutory language for mass actions required "100 or more persons," unlike CAFA's class action provision, and further recognizing that CAFA defines "class members" as including unnamed parties—which does not apply to mass actions).

143.    For these reasons, consistent with Congress's purpose and effect in enacting CAFA, and the Supreme Court's directive that federal courts have an obligation to exercise their jurisdiction, "a federal court must rigorously examine a matter removed under CAFA to ensure that [the court] does not prematurely preclude a class action (in all but name) from the court's jurisdiction." *Comcast,* 705 F. Supp. 2d at 448-49.

144.    That is the case here. New Mexico brought claims for relief in which individuals who are diverse to Dolgencorp are the real parties in interest. For example, New Mexico seeks restitution on behalf of the New Mexico consumers who purchased a DG Auto motor oil product. Compl. ¶¶ 109, 111; *id.* at 32, Request for Relief ¶ F.

145.    This restitution will not be paid to the state of New Mexico. Instead, it will be awarded to those private individuals. *See, e.g.*, *State ex rel. King v. B & B Inv. Grp., Inc.*, 329 P.3d 658, 674 (N.M. 2014) (New Mexico "sought restitution in the form of a full refund for borrowers of all money paid in excess of the principal on their loans."); *Atherton v. Gopin*, 340 P.3d 630, 635 (N.M. Ct. App. 2014) ("With regard to the Attorney General, the sole issue was the amount of restitution payable to the 110 clients who responded to the Attorney General's letters informing all of Gopin's former clients of the existence of the action.").

146.     Even New Mexico's injunctive relief is not intended to protect New Mexico's sovereign interests. New Mexico requests the imposition of a specific state-approved program whereby "all Dollar General customers" can benefit from notice and a vehicle inspection, repair, and replacement. Compl. at 32, Request for Relief ¶ C(1)-(3). This requested relief is both too broad and too narrow to qualify as an interest benefiting New Mexico as a sovereign. It is too broad because the requested relief reaches nationwide to all Dolgencorp customers—and New Mexico has no sovereign interest in other states' residents. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003). It is too narrow because the requested relief does not benefit the state against future harm, but instead focuses on remedying an alleged past harm affecting the private property interests of a select portion of the New Mexico population (among other states).

147.     New Mexico citizens are real parties in interest. This means that there is minimal diversity between these plaintiffs and Dolgencorp. *See, e.g.*, *Caldwell*, 536 F.3d at 429-30 (in suit brought on behalf of Louisiana, relief seeking treble damages was on behalf of private individuals who were the real parties in interest, thus establishing minimal diversity under CAFA); *McGraw*, 704 F. Supp. 2d at 449-50 (same holding in suit brought on behalf of West Virginia); *Connecticut v. Levi Strauss & Co.*, 471 F. Supp. 363, 371 (D. Conn. 1979) ("When Connecticut claims refunds to be distributed to identifiable purchasers, the citizen status of the purchasers rather than the sovereign status of their benefactor controls for diversity purposes.").

**C.  The class size requirement is met.**

148.     CAFA requires at least 100 persons to qualify for the putative class. *See* 28 U.S.C. § 1332(d)(5). Documents produced to New Mexico in response to a civil investigative demand

show that "hundreds of thousands" of DG Auto motor oil product was sold in New Mexico. *See* Doc. 1, at ¶ 78, *Dollar General Corporation v. Balderas*, No. 1:17-cv-00588-NF-KHR (D.N.M. May 25, 2017); *see also* Compl. ¶ 107. It is reasonable to determine those thousands of units were purchased by at least 100 persons.

**D. The amount in controversy requirement is met.**

149.    CAFA has a $5,000,000 amount in controversy requirement. 28 U.S.C. § 1332(d)(2). This figure is met through numerous avenues.

150.    First, New Mexico seeks the maximum $500 penalty under the FAA, and the maximum $5,000 penalty under the UPA, for each sale and advertisement of the at-issue motor oil products. Compl. ¶¶ 104-08, 119-23. Documents produced to New Mexico in response to a civil investigative demand show that Dolgencorp sold "hundreds of thousands" of DG Auto motor oil products in New Mexico. *See* Doc. 1, at ¶ 78, *Dollar General Corporation v. Balderas*, No. 1:17-cv-00588-NF-KHR (D.N.M. May 25, 2017). Based upon New Mexico's requested relief, and using the above numbers, there is no doubt that the $5,000,000 threshold is exceeded.[10]

151.    Second, New Mexico seeks restitution on behalf of New Mexico residents (and thus class members). Compl. at 32, Request for Relief ¶ F. This enlarges the amount in controversy.

152.    Third, New Mexico seeks injunctive relief in forcing Dolgencorp to fund a state-approved program that requires notice to "all Dollar General customers"—not just those who

---

[10] In fact, New Mexico wants to impose a $5,000 penalty for "each" of the "multiple violations [of the UPA] on each and every day" since 2010. Compl. ¶¶ 107-08. Although New Mexico is not entitled to any relief, simple math (365 days * 7 years * $5,000) puts the requested relief well above the $5,000,000 mark.

purchased DG Auto motor oil products, and not just those within New Mexico—and a vehicle inspection, repair, and replacement for those automobiles in which DG Auto motor oil was used. *Id.* at 32, Request for Relief ¶ C(1)-(3). CAFA's amount in controversy requirement is appropriately understood as including the pecuniary costs to the defendant to comply with injunctive and declaratory relief. *Adams v. Am. Family Mut. Ins. Co.*, 981 F. Supp. 2d 837, 845-51 (S.D. Iowa 2013); *see Valdez v. Metro. Prop. & Cas. Ins. Co.*, 867 F.Supp.2d 1143 (D.N.M. 2012). To the extent any doubt remained about meeting the $5,000,000 threshold, it would be assuaged by such an enormous and expensive undertaking.

### III.    This Court has supplemental jurisdiction over all other claims.

153.    This Court needs jurisdiction over only one claim to have subject matter jurisdiction over the entirety of New Mexico's civil action. *See* 28 U.S.C. § 1367(a); *Chicago v. International Coll. Of Surgeons*, 522 U.S. 156, 165-66 (1997); *Kimbrell v. Chaves Cnty. Clerk*, 562 F. App'x 722, 723 (10th Cir. 2014); *Ruby v. Sandia Corp.*, 699 F. Supp. 2d 1247, 1282 (D.N.M. 2010.).

154.    As this Court has subject matter jurisdiction over at least one of New Mexico's claims, and that claim is properly removed, this Court has supplemental jurisdiction over New Mexico's other claims because they arise out of a common nucleus of operative facts. *Carroll v. Albuquerque*, 749 F. Supp. 2d 1216, 1223 n.3 (D.N.M. 2010).

### CONCLUSION

155.    New Mexico's civil action invokes federal jurisdiction. Dolgencorp thus effects timely removal of New Mexico's civil action to this Court.[11]

---

[11] Dolgencorp reserves its right to amend or supplement this notice.

DATED: July 26, 2017

Respectfully submitted,

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By:

Todd E. Rinner
Jeffrey M. Croasdell
201 Third St., NW #2200
Albuquerque, NM 87102
Telephone: (505) 768-7332
Email: trinner@rodey.com
        jcroasdell@rodey.com

*Attorneys for Dolgencorp, LLC*

and

*(not yet admitted proc hac, identified for convenience only)*

MCGUIREWOODS LLP
R. Trent Taylor (*admission pending*)
Perry W. Miles, IV (*admission pending*)
Jontille D. Ray (*admission pending*)
Travis C. Gunn (*admission pending*)
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-1182
Fax: (804) 225-5409
Email: rtaylor@mcguirewoods.com
        pmiles@mcguirewoods.com
        jray@mcguirewoods.com
        tgunn@mcguirewoods.com

*Attorneys for Dolgencorp, LLC*

41